IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.                                                   Criminal No. ELH-17-0390

STANLEY RICHARDSON,
*Defendant*.

**MEMORANDUM OPINION**

Stanley Richardson, defendant, entered a plea of guilty on August 13, 2021, to the offense of possession with intent to distribute 28 grams or more of cocaine base, in violation of 21 U.S.C. § 841.  ECF 48; ECF 49 ("Plea Agreement").  Although the plea was not entered under Fed. R. Crim. P. 11(c)(1)(C), the parties contemplated a sentencing range between 96 months and 120 months of incarceration.  In particular, defendant reserved the right to appeal if the Court imposed a sentence greater than 120 months of imprisonment, and the government reserved the right to appeal if the Court imposed a sentence of less than 96 months of imprisonment.  ECF 49, ¶¶ 10(b)(i)–(ii).

Sentencing was held on December 2, 2021.  ECF 58.  I sentenced defendant to 100 months of imprisonment, with credit for time served between August 10, 2017, and February 21, 2018, and from June 29, 2020, until the date of sentencing.  ECF 59 ("Judgment").

Defendant filed an "Emergency Motion for Compassionate Release Pursuant to 18 U.S.C. § 3582I(1)(A)."  ECF 70 ("Motion").  The Office of the Federal Public Defender has declined to represent Richardson in regard to the Motion.  ECF 72.  The government opposes the Motion. ECF 75 ("Opposition").

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6. For the reasons that follow, I shall grant the Motion in part, and reduce defendant's sentence to 96 months of imprisonment.

## I. Background

In a two-count Indictment returned on July 25, 2017, a Grand Jury in the District of Maryland charged defendant with possession with intent to distribute 28 grams or more of cocaine base, in violation of 21 U.S.C. § 841(a)(1) (Count One), and possession of ammunition by a felon, in violation of 18 U.S.C. § 922(g)(1) (Count Two). ECF 1.

Richardson pleaded guilty to Count One of the Indictment on August 13, 2021. ECF 48; ECF 49, ¶ 1. The government agreed to dismiss Count Two at the time of sentencing. ECF 49, ¶ 9. In the Plea Agreement, the parties stipulated to the following facts, *id.* at 9:

> On January 4, 2017, a search warrant was executed at the Defendant's residence in Anne Arundel County, Maryland. The search revealed in excess of 28 grams of cocaine base, "crack" cocaine, a Schedule II controlled substance. The Government was prepared to call an expert witness had the case gone to trial that the amount of cocaine base seized was indicative of an intent to distribute and was not merely for personal use.

The parties also "agree[d] that the applicable base offense level is a level 24," pursuant to § 2D1.1(c)(8) of the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G."). *Id.* ¶ 6(a) (emphasis omitted). And, the government agreed to a three-level reduction in defendant's offense level under U.S.S.G. § 3E1.1. *Id.* ¶ 6(b).

With respect to defendant's criminal history, the Plea Agreement provided, *id.* ¶ 7:

> There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level. Specifically, the Defendant understands that the Defendant's criminal history could alter the final offense level if the Defendant is determined to be a career offender or if the instant offense was a part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

As noted, in the Plea Agrement the parties did not agree to a specific sentence pursuant to Fed. R. Crim. P. 11(c)(1)(C).  However, they clearly contemplated a sentence ranging from 96 to 120 months of imprisonment.  In particular, the defendant reserved the right to appeal if the Court imposed a sentence greater than 120 months of imprisonment, ECF 49, ¶ 10(b)(i), and the government reserved the right to appeal if the Court imposed a sentence less than 96 months of imprisonment.  *Id.* ¶ 10(b)(ii).

The Presentence Report ("PSR," ECF 53) indicated that Richardson had eleven prior adult criminal convictions.  *Id.* ¶¶ 25–35.  Eight of these convictions were for drug offenses.  *Id.* ¶¶ 25–30, 32, 35.  Five of defendant's eight drug offenses were "distribution-related."  *Id.* at 29.  Defendant had also been convicted of assault, *id.* ¶ 27, and possession of a firearm by a felon.  *Id.* ¶ 33.  Defendant's criminal convictions resulted in a criminal history score of 18.  *Id.* ¶ 36.  Accordingly, defendant had a criminal history category of VI.  *Id.* ¶ 37.

The PSR determined that Richardson qualified as a career offender, pursuant to § 4B1.1 of the Guidelines.  *Id.* ¶ 38.  The PSR designated two predicate offenses.  *See id.* 38.  They were defendant's 1999 conviction in the Circuit Court for Anne Arundel County for distribution of a controlled dangerous substance, *id.* ¶ 28, and defendant's 2019 conviction in a North Carolina state court for attempted trafficking of four to fourteen grams of heroin.  *Id.* ¶ 35.[1]

Defendant's designation as a career offender increased his offense level from 24 to 34, pursuant to U.S.S.G. § 4B1.1(b).  *Id.* ¶ 19.  After a three-point deduction for acceptance of

---

[1] As discussed, *infra,* the PSR erroneously designated Richardson's 2019 conviction as a "prior" felony conviction under U.S.S.G. § 4B1.2(c).  Richardson committed the underlying offense in January 2017.  ECF 53, ¶ 8.  The conduct at issue in North Carolina occurred in December 2018, for which defendant was convicted in December 2019.  *Id.* ¶ 35.  Therefore, the conviction was not a "prior" conviction.

responsibility, the PSR determined that Richardson had a final offense level of 31. *Id.* ¶ 22. And, he had a criminal history category of VI under U.S.S.G. § 4B1.1(b). *Id.* ¶ 36.

The offense carried a mandatory minimum term of 60 months imprisonment. *Id.* ¶ 86. And, the Guidelines called for a sentence ranging from 188 to 235 months of imprisonment. *Id.* ¶ 87.

Sentencing was held on December 2, 2021. ECF 58. According to the PSR, Richardson was 54 years old at the time. ECF 53 at 2. The Sentencing Transcript is docketed at ECF 66. At sentencing, the Court asked the parties if they had "any objection to any information" in the PSR, "including the guidelines calculations." *Id.* at 3. The parties did not raise any objections, and the Court adopted the calculations in the PSR. *Id.*

At sentencing, both sides requested a sentence within the agreed range of 96 to 120 months of incarceration. *Id.* at 7, 9, 12. In particular, the government stated that, in weighing all of the factors under 18 U.S.C. § 3553(a), it "believes that the agreed-upon disposition, eight to ten years, is appropriate in this case. *Id.* at 7. Defendant requested "a sentence of eight years." *Id.* at 9, 12. And, I imposed a sentence of 100 months of imprisonment. ECF 59 at 2.

On February 7, 2022, Richardson filed correspondence with the Court that I characterized as a motion to reduce his sentence. ECF 62. In that motion, defendant asked the Court to correct his "illegal sentence," stating that the amount of crack cocaine that he possessed on the date of the offense was 14 grams, not 28 grams, as charged. *Id.* The government opposed the motion. ECF 65. By Order of March 30, 2022, the Court denied the motion. ECF 68.

In May 2023, Richardson filed two additional motions:  one for post-conviction relief (ECF 79) and one to correct an illegal sentence.  ECF 80.  By Memorandum Opinion and Order of November 29, 2023, I denied both motions.  *See* ECF 83; ECF 84.[2]

In the interim, on December 12, 2022, Richardson filed the instant Motion, asking the Court to reduce his sentence to time served.  ECF 70 at 1–2.  The government opposes the Motion.  ECF 75.  With its Opposition, the government has submitted about 178 pages of defendant's prison medical records.  ECF 75-1 to ECF 75-4.

Richardson was born in 1967 and is now 56 years of age.  ECF 53 at 2.  He is incarcerated at the Federal Correctional Institution, Butner.  *See Find an inmate*, Federal Bureau of Prisons, https://www.bop.gov/inmateloc/ (last accessed December 4, 2023).  In October 2022, defendant committed two disciplinary infractions: "possessing drugs/alcohol," and "refusing to obey an order."  ECF 75-4.

With credit for time served from August 10, 2017, to February 21, 2018, and from June 19, 2020, to December 2, 2021, defendant has served about 47 months, or 47 percent, of his total sentence.  *See* ECF 59 at 2.  He has a projected release date of December 19, 2026.  *Find an inmate*, *supra*, https://www.bop.gov/inmateloc/.

## II.      Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Brown*, 78 F.4th 122, 128 (4th Cir. 2023); *United States v. Malone*, 57 F.4th 167, 173 (4th Cir. 2023); *United States v. Bond*, 56 F. 4th 381, 383 (4th Cir. 2023); *United States v. Bethea*, 54 F.4th 826, 831 (4th Cir. 2022); *United States v. Ferguson*, 55 F.4th 262, 267 (4th Cir. 2022); *United States v. Hargrove*, 30 F.4th 189, 194 (4th Cir. 2022);

---

[2] I incorporate here the factual and procedural summary set forth in ECF 83.

*United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020), *abrogated on other grounds by United States v. Troy*, 64 F.4th 177 (4th Cir. 2023); *United States v. Jackson*, 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019).   But, "the rule of finality is subject to a few narrow exceptions."   *Freeman v. United States*, 564 U.S. 522, 526 (2011).   One such exception is when the modification is "expressly permitted by statute."   *See* 18 U.S.C. § 3582(c)(1)(B); *see also Jackson*, 952 F.3d at 495.

Section 3582 of Title 18 of the United States Code was first enacted as part of the Sentencing Reform Act of 1984.   As originally enacted, it permitted a court to alter a sentence only upon motion by the Director of the BOP.   *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984). This meant that a defendant seeking compassionate release had to rely on the BOP Director for relief.   *See Bethea*, 54 F.4th at 831; *see*, *e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866–67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

For many years, compassionate release was an infrequent occurrence, because the BOP rarely filed such a motion on an inmate's behalf.   *See Hr'g on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).   However, as a result of the enactment of the First Step Act ("FSA") in December 2018, a federal inmate could file a motion for compassionate release directly with the court, so long as the inmate first exhausted administrative remedies.   *See* Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018) (codified as 18 U.S.C. § 3582(c)(1)(A)); *see also United States v. McCoy*, 981 F.3d 271, 275–76 (4th Cir. 2020).

With the passage of the 2018 FSA, Congress "broadened" the authority of courts to grant sentencing modifications. *Malone*, 57 F.4th at 173. Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) authorizes courts to modify a defendant's sentence if "extraordinary and compelling reasons warrant such a reduction." *Hargrove*, 30 F.4th at 194. This provision is an exception to the ordinary rule that a federal sentence is final. *United States v. Jenkins*, 22 F.4th 162, 169 (4th Cir. 2021). The FSA resulted in a sea change in the law.

In particular, the 2018 FSA authorized a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first. 18 U.S.C. § 3582(c)(1)(A) (emphasis added). That is, once a defendant has exhausted his administrative remedies, or after 30 days have passed from the date on which the warden has received the defendant's request, the defendant may petition a court directly for compassionate release. *Ferguson*, 55 F.4th at 268; *Jenkins*, 22 F.4th at 169; *United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *McCoy*, 981 F.3d at 276.

Nonetheless, there are restrictions. Under 18 U.S.C. § 3582(c)(1)(A), the court may modify the defendant's sentence only if two criteria are met. *Brown*, 78 F.4th at 128; *Bethea*, 54 F.4th at 831. In other words, the analysis consists of "two steps." *Bond*, 56 F.4th at 383.

"First, the court must determine the prisoner is eligible for a sentence reduction because he has shown 'extraordinary and compelling reasons' supporting relief." *Bethea*, 54 F.4th at 831 (citation omitted); *see also Bond*, 56 F.4th at 383; *United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam), *cert. denied*, ___ U.S. ___, 142 S. Ct. 383 (2021). If that criterion is met, the court "must then find that release is appropriate under the 18 U.S.C. § 3553(a) sentencing

factors, to the extent those factors are applicable." *Bethea*, 54 F.4th at 831; *see also Malone*, 57 F.4th at 174; *Hargrove*, 30 F.4th at 194; *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021); *Kibble*, 992 F.3d at 330.

Generally, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis." *Jenkins*, 22 F.4th at 169. However, as the Fourth Circuit has recognized, "when deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)).

The Policy Statement codified at U.S.S.G. § 1B1.13 is titled "Reduction in Term of Imprisonment Under 18 U.S.C. § 3582(c)(1)(A)" ("Policy Statement"). Critically, as discussed below, amendments to the Policy Statement took effect on November 1, 2023. Prior to the amendments, however, the Policy Statement began: "Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment . . . ." U.S.S.G. 1B1.13 (2021). Interpreting this language in *McCoy*, 981 F.3d at 282, the Fourth Circuit stated that, "[b]y its plain terms . . . § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." Therefore, on the basis of that earlier text, the Court held: "When a defendant exercises his . . . right to move for compassionate release on his own behalf, § 1B1.13 does not apply, and thus § 3582(c)(1)(A)'s consistency requirement does not constrain the discretion of district courts." *McCoy*, 781 F.3d at 281. As a result, district courts were "empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'" *Id.* at 284 (citation omitted); *see also Jenkins*, 22 F.4th at 170.

As indicated, the Fourth Circuit based its holding in *McCoy* and other cases on a version of the Policy Statement that has since been amended, effective November 1, 2023.  *See* Sentencing Guidelines for United States Courts, 88 Fed. Reg. 28254 (May 3, 2023) (providing notice of amendments to Congress).  In particular, as a result of the amendments that took effect on November 1, 2023, the Policy Statement now begins: "Upon motion of the Director of the Bureau of Prisons *or the defendant* pursuant to 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment . . . ."  U.S.S.G. § 1B1.13 (2023) (emphasis added).  Thus, the Sentencing Commission has made the Policy Statement expressly applicable to defendant-filed motions under § 3582(c)(1)(A).  *Cf. McCoy*, 981 F.3d at 282.

Therefore, it appears that the Fourth Circuit's conclusion in *McCoy*, 981 F.3d at 281, to the effect that "§ 1B1.13 is not an 'applicable' policy statement," is no longer consistent with the Guidelines, as amended.  This is because the Policy Statement is now expressly applicable to defendant-filed motions pursuant to 18 U.S.C. § 3582(c)(1)(A). [3]

A court must ensure that any sentence reduction "is consistent with" the Policy Statement's provisions.  18 U.S.C. § 3582(c)(1)(A).  The Policy Statement provides, in part, U.S.S.G. § 1B1.13(a):

> (B) IN GENERAL.—Upon motion of the Director of the Bureau of Prisons or the defendant pursuant to 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—

---

[3] Defendant's Motion was filed on December 22, 2022, before the amendments to U.S.S.G. § 1B1.13 took effect.  But, the Court applies the law in effect at the time of its decision, not the law in effect at the time the Motion was filed.  *Cf., Maryland Shall Issue, Inc. v. Governor Wes Moore*, ___ F.4th ___, 2023 WL 8043827 (4th Cir. Nov. 21, 2023) (ruling in accordance with law in effect at the time of the appellate decision, not the law in effect at the time of the district court's decision).  In any event, the Court would reach the same outcome under the law in effect before the amendments of November 1, 2023.

    (1) (A) extraordinary and compelling reasons warrant the reduction; or

        (B) the defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which the defendant is imprisoned;

    (2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and

    (3) the reduction is consistent with this policy statement.

The Policy Statement identifies six circumstances that, individually or in combination, may provide "extraordinary and compelling reasons" for a reduction in sentence. *Id.* § 1B1.13(b)(1)–(6). These are: certain medical circumstances of the defendant, such as terminal illness or the inability to receive specialized medical care while incarcerated, *id.* § 1B1.13(b)(1); the defendant's age, *id.* § 1B1.13(b)(2); the defendant's family circumstances, *id.* § 1B1.13(b)(3); the fact that the defendant, while in custody, was the victim of sexual or physical abuse committed by, or at the direction, of a correctional officer, *id.* § 1B1.13(b)(4); the defendant received an "unusually long sentence," *id.* § 1B1.13(b)(6); and "any other circumstances or combination of circumstances . . . similar in gravity to" the circumstances "described in paragraphs (1) through (4)." *Id.* § 1B1.13(b)(5).

Prior to the amendments, the district court was obligated to consider all non-frivolous arguments for sentence reduction based on intervening changes in the law and factual developments. *Concepcion v. United States*, ___ U.S. ___, 142 S. Ct. 2389, 2396 (2022); *Troy*, 64 F.4th at 184; *United States v. Reed*, 58 F.4th 816, 822 (4th Cir. 2023); *United States v. Brice*, 2022 WL 3715086, at *2 (4th Cir. Aug. 29, 2022) (per curiam). Where appropriate, the district court had to "account not only for the circumstances at the time of the original offense but also for significant post-sentencing developments." *United States v. Mangarella*, 57 F.4th 197, 203 (4th

Cir. 2023); *see Martin*, 916 F.3d at 397; *Kibble*, 992 F.3d at 334 n.3.  However, such developments did not warrant a recalculation of the Guidelines.  *Troy*, 64 F.4th at 184.

Notably, § 1B1.13(c) of the Policy Statement now specifies that, "[e]xcept as provided in subsection (b)(6)," which concerns an "unusually long sentence," "a change in the law (including an amendment to the Guidelines Manual that has not been made retroactive) shall not be considered for purposes of determining whether an extraordinary and compelling reason exists under this policy statement."  However, "if a defendant otherwise establishes that extraordinary and compelling reasons warrant a sentence reduction under [the Policy Statement], a change in the law (including an amendment to the Guidelines Manual that has not been made retroactive) may be considered for purposes of determining the extent of any such reduction."  *Id.*

Section 1B1.13(d) of the Policy Statement, which limits the weight a court may assign to a defendant's rehabilitation while serving a sentence, is also relevant.  It provides that, "[p]ursuant to 28 U.S.C. §994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement."  *Id.*  "However, rehabilitation of the defendant while serving the sentence may be considered in combination with other circumstances in determining whether and to what extent a reduction in the defendant's term of imprisonment is warranted."  *Id.*

Even if a defendant establishes that extraordinary and compelling reasons warrant relief, the court must also consider the sentencing factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate.  *See Dillon v. United States*, 560 U.S. 817, 826–27 (2010); *Brown*, 78 F.4th at 128; *Mangarella*, 57 F.4th at 200, 203; *Malone*, 57 F.4th at 174; *Bethea*, 54 F.4th at 833; *Hargrove*, 30 F.4th at 195; *High*, 997 F.3d at 186; *Martin*, 916 F.3d at 397; *see also United States v. Jones*, 2022 WL 2303960, at *1 (4th Cir. June 27, 2022)

(per curiam) (noting that "a court need not explicitly make findings on extraordinary and compelling reasons where consideration of the § 3553(a) factors counsels against release"); *United States v. Butts*, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion); *Kibble*, 992 F.3d at 329–30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 F. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d at 693–94 (district court must give due consideration to the § 3553(a) factors). Notably, the recent amendments to the Guidelines did not alter this requirement.

The "factors include 'the nature and circumstances of the offense'; 'the history and characteristics of the defendant'; and the need for the sentence to 'provide just punishment,' 'afford adequate deterrence,' 'protect the public from further crimes of the defendant,' and 'provide the defendant with . . . training, medical care, or other correctional treatment.'" *Jenkins*, 22 F.4th at 170 (quoting 18 U.S.C. § 3553(a)). As the Fourth Circuit has observed, "'many case-specific facts fit under the broad umbrella of the Section 3553(a) factors.'" *Bond*, 56 F.4th at 384 (quoting *Jackson*, 952 at 500). And, in weighing the § 3553(a) factors, the court may consider the terms of a plea bargain. *Bond*, 56 F.4th at 384–85.

"A district court need not provide an exhaustive explanation analyzing every § 3553(a) factor," nor is it "required to address each of a defendant's arguments when it considers a motion for compassionate release." *Jenkins*, 22 F.4th at 170; *see Chavez-Meza v. United States*, ___ U.S.

___, 138 S. Ct. 1959 (2018); *High*, 997 F.3d at 187.  But, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law." *High*, 997 F.3d at 187 (internal quotation marks omitted); *see Jenkins*, 22 F.4th at 167; *see also Brown*, 78 F.4th at 132 (criticizing district judge's "cursory" consideration of the § 3553(a) factors); *United States v. Dillard*, 891 F.3d 151, 158 (4th Cir. 2018).  And, "'the record as a whole'" must demonstrate that the judge considered the parties' contentions and had "'a reasoned basis'" for the exercise of judicial discretion.  *Malone*, 57 F.4th at 176 (citations omitted); *see also United States v. Puzey*, 2023 WL 2985127, at *2 (4th Cir. Apr. 18, 2023) (per curiam).

That said, "[h]ow much explanation is 'enough' depends on the complexity of a given case." *Gutierrez*, 2023 WL 245001, at *3; *see United States v. McDonald*, 986 F.3d 402, 412 (4th Cir. 2021).  For example, "when a defendant 'present[s] a significant amount of post-sentencing mitigation evidence, . . . a more robust and detailed explanation [is] required.'" *United States v. Cohen*, 2022 WL 2314300, at *1 (4th Cir. June 28, 2022) (per curiam) (quoting *High*, 997 F.3d at 190) (alterations in *Cohen*).  In providing such an explanation, "a district court is permitted to add to its original, sentencing-phase consideration of the § 3553(a) factors when explaining its compassionate release ruling." *Bethea*, 54 F.4th at 834; *see Kibble*, 992 F.3d at 332.  In any event, "the court must provide an explanation sufficient 'to allow for meaningful appellate review' in light of the particular circumstances of the case." *Cohen*, 2022 WL 2314300, at *1 (quoting *High*, 997 F.3d at 190).

### III.  COVID-19

### A.

Health officials confirmed the first case of COVID-19 in the United States on January 31, 2020.[4]  *United States v. Pair*, 84 F. 4th 577, 580 (4th Cir. 2023) (citation omitted).  Then, on March 11, 2020, the World Health Organization declared COVID-19 a global pandemic.  *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[5]  Two days later, on March 13, 2020, President Trump declared a national emergency concerning the COVID-19 pandemic.  *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19)*, TRUMP WHITE HOUSE (Mar. 13, 2020), https://perma.cc/WF55-8M4P.  That declaration was extended on several occasions.  *See*, *e.g.*, 88 Fed. Reg. 9385 (Feb. 10, 2023).

The pandemic spawned "a public health crisis more severe than any seen for a hundred years."  *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020), *aff'd in part, dismissed in part*, 2022 WL 1449180 (4th Cir. May 9, 2022) (per curiam). Indeed, for a significant period, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it."  *Cameron v. Bouchard*, 462 F. Supp. 3d 746, 752–53 (E.D. Mich. 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020).  Schools and businesses were closed, or operated on a limited basis, in an effort to thwart the spread of the virus, which is extremely contagious.  *Pair*, 84 F.4th at 589; *see Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (August 11, 2022), https://perma.cc/QGL2-3URS.  As the Fourth Circuit has put it,

---

[4] The Court may take judicial notice of matters of public record.  *See* Fed. R. Evid. 201.

[5] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://perma.cc/24J3-UQZN.

in the early months of 2020, "a new reality set in.  Nations around the world announced stringent limitations on in-person interaction . . . businesses ground to a halt; and death tolls mounted." *Pair*, 84 F.4th at 580.

The judges of this Court "have written extensively about the pandemic." *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic.  *Id.*  Nevertheless, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918.  *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020), *abrogation on other grounds recognized by United States v. Phillibert*, 557 F. Supp. 3d 456 (S.D.N.Y. 2021) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration.").

People infected with the coronavirus sometimes experience only mild or moderate symptoms.  But, particularly at the outset of the pandemic, the virus caused severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).  On May 11, 2022, the United States "reached more than 1 million COVID-19 deaths, according to a Reuters tally, crossing a once-unthinkable milestone about two years after the first cases upended everyday life."  Trevor Hunnicutt & Jeff Mason, *Biden Marks One Million U.S. COVID Deaths After Losing Political Battles*, Reuters (May 12, 2022), https://perma.cc/TLA5-YNFB.  And, as of March 10, 2023—the last day on which Johns Hopkins University updated its COVID-19 data—more than 103.8 million Americans had been infected with COVID-19.  *See COVID-19 Dashboard*, The Johns Hopkins Univ., https://perma.cc/J7XS-FYHT.

The Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the coronavirus, and has repeatedly revised its guidance concerning medical conditions that pose a greater risk of severe illness due to COVID-19. The CDC most recently updated its guidance in May 2023 to reflect the most current data. *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 11, 2023), https://perma.cc/923J-T5P8.

According to the CDC, the factors that increase the risk of severe illness include cancer; chronic kidney disease; chronic liver disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); disabilities such as Down syndrome; heart conditions such as heart failure, coronary artery disease, cardiomyopathies, and possibly hypertension; HIV; being immunocompromised; liver disease; having a BMI 25 or higher; physical inactivity; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; substance use disorders; and tuberculosis. *People with Certain Medical Conditions*, *supra*, https://perma.cc/923J-T5P8.

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. *See COVID-19 Risks and Information for Older Adults*, CTRS. FOR DISEASE CONTROL & PREVENTION (Feb. 22, 2023), https://perma.cc/VG23-TQMM. Furthermore, "[t]he risk of severe illness from COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*, https://perma.cc/923J-T5P8.

**B.**

As noted, the coronavirus is "highly contagious." *Pair*, 84 F.4th at 589.  At the outset of the pandemic, some of the "measures we now know to be useful in combating the spread of the virus (such as masking, separation . . . and vaccinations) were either nascent or, as in the case of vaccines, unavailable." *Id.*  Nevertheless, in an effort to prevent the spread of COVID-19, the CDC urged, *inter alia*, the practice of "social distancing." *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CENTERS FOR DISEASE CONTROL & PREVENTION (Jan. 26, 2023), https://perma.cc/UJ98-2V6S; *see also Pair*, 84 F.4th at 585.

However, social distancing and "rigorous personal hygiene," which are "important combatants to the virus," are particularly difficult in the penal setting.  *Seth*, 461 F. Supp. 3d at 248.  Indeed, prisoners have little ability to protect themselves from the threat posed by the coronavirus.  *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high."). Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others.  Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020), https://perma.cc/3RHL-WNKU.  And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We Do Not Feel Safe,'* WASH. POST (Aug. 24, 2020),

https://perma.cc/K6SW-LFGX (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep.  Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to limit their spread.  *See Coreas v. Bounds*, TDC-20-0780, 451 F. Supp. 3d 407, 413 (D. Md. 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021), https://perma.cc/TR7Q-8H9J ("The cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease.  Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519–20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, "in recognition of [the] stark reality" that COVID-19 posed substantial challenges to incarcerated individuals, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus.  *Seth*, 461 F. Supp. 3d at 248.  Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected.  As the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020), the BOP made "extensive and professional efforts to curtail the virus's spread."

Thereafter, on March 26, 2020, then Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19.  *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020).  And, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281.  In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General.  *See* Pub. L. No. 116-136, § 12003(b)(2).  On April 3, 2020, then Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ."  *Hallinan*, 2020 WL 3105094, at *9.  That memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ."  *Id.*

Two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum on May 8, 2020, to implement the Attorney General's directives on the increased use of home confinement.  The memorandum provided that the BOP should prioritize for review for home confinement eligibility those inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

### C.

There is no cure for the coronavirus.  But, medical therapies have continued to improve, and vaccines are now generally available.  *See Stay Up to Date with COVID-19 Vaccines*, CENTERS FOR DISEASE CONTROL & PREVENTION (Oct. 4, 2023), https://perma.cc/VZ77-KN7W.  Although the vaccines do not appear to prevent illness, they do seem to reduce the seriousness of the illness.

On January 4, 2021, at about the time the first vaccines became available, the BOP published "COVID-19 Vaccine Guidance." *See COVID-19 Vaccine Guidance*, FEDERAL BUREAU OF PRISONS CLINICAL GUIDANCE (Jan. 4, 2021), https://perma.cc/P4KL-PEZW. It provided that administration of the COVID-19 vaccines (Pfizer and Moderna) would "align with [recommendations of] the Centers for Disease Control and Prevention." *Id.* at 4. Its plan was for prisoners at heightened risk to receive priority for the vaccine. *Id.* at 6. The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, *Federal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, FORBES (Dec. 21, 2020), https://perma.cc/2FF2-G6PX.

Much has changed since the coronavirus first emerged in early 2020. And, the virus, too, has changed repeatedly, with multiple strains and variants. As of May 11, 2023—the last day on which the CDC updated its vaccine tracker—approximately 69% of the total U.S. population had completed their primary vaccination series (i.e., one dose of a single-dose vaccine or two doses on different days), including 32% of people from ages 5 to 11, 61% of people from ages 12 to 17, 66% of people from ages 18 to 24, 72% of people from ages 25 to 49, 83% of people from ages 50 to 54, and 94% of people ages 65 and up. *See COVID-19 Vaccinations in the United States*, CTRS. FOR DISEASE CONTROL, https://perma.cc/B2KG-M4E3 (final update May 11, 2023); *Trends in Demographic Characteristics of People Receiving COVID-19 Vaccinations in the United States*, CTRS. FOR DISEASE CONTROL, https://perma.cc/6W5Q-55DR (final update May 11, 2023).

### D.

In an interview in September 2022 on the CBS television show "60 Minutes", President Biden declared that the pandemic was "over" in the United States. Alexander Tin, *Biden Says Covid-19 Pandemic is "Over" in U.S.*, CBS NEWS (Sept. 19, 2022). He stated: "The pandemic is

over.  We still have a problem with COVID.  We're still doing a lotta work on it . . . .  But the pandemic is over."  *Id*.  And, on April 10, 2023, President Biden signed into law House Joint Resolution 7, "which terminate[d] the national emergency related to the COVID-19 pandemic." Pub. L. No. 118-3, 137 Stat. 6 (2023).

Nevertheless, at the time of this writing, data suggests that COVID-19 remains prevalent. *See   COVID   Data   Tracker*, CNTRS. FOR DISEASE CONTROL & PREVENTION, https://covid.cdc.gov/covid-data-tracker/#datatracker-home   (last   updated   Dec.   4,   2023). Moreover, available data may not provide a full picture of COVID-19's spread, because "[s]ince the end of the public health emergency on May 11, 2023, data that has been crucial to understanding the spread and impact of Covid is reported by government sources less frequently, or is no longer reported at all."  *Track Covid-19 in the U.S.*, THE NEW YORK TIMES, https://www.nytimes.com/interactive/2023/us/covid-cases.html (last updated Dec. 4, 2023).

### IV. Discussion

### A.

In his Motion, Richardson asserts that his medical conditions, which include "obesity, [a] very serious upper respiratory condition, and high blood pressure," provide an extraordinary and compelling reason for release because they leave him especially vulnerable to severe COVID-19. ECF 70 at 1.  In addition, defendant asserts that he has exhausted his administrative remedies.  *Id.* at 5.

In its Opposition (ECF 75), the government concedes that Richardson has exhausted his administrative remedies.  *Id.* at 6.  However, according to the government, Richardson's medical conditions do not constitute an extraordinary and compelling reason for release because they are well controlled by diet, exercise, and medication.  *Id.* at 5–6.  Moreover, in the government's view,

the sentencing factors under 18 U.S.C. § 3553(a) counsel against a reduction in sentence.  In

particular, the government asserts, *id.* at 8:

> Already having incurred several prior convictions involving controlled substances
> as well as a proper conviction for possessing a firearm as a prohibited person,
> [Richardson] stood before the court as a long-time repeat offender whose prior
> probationary periods ended in violations.  Neither structured rules nor actual jail
> time deterred his conduct.  Even while serving this sentence, [Richardson] has
> incurred an infraction for possessing drugs/alcohol and refusing to obey an order.

As noted, effective November 1, 2023, § 1B1.13(b)(1) of the Policy Statement identifies

four circumstances under which a defendant's medical condition may provide an extraordinary

and compelling reason for relief.  *See* U.S.S.G. § 1B1.13(b)(1)(A)–(D).  First, under

§ 1B1.13(b)(1)(A), "a terminal illness (*i.e.,* a serious and advanced illness with an end-of-life

trajectory)," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-

stage organ disease, and advanced dementia," may provide an extraordinary and compelling reason

for relief.  Second, under § 1B1.13(b)(1)(B), an extraordinary or compelling reason may exist if

the defendant is "suffering from a serious physical or medical condition," "suffering from a serious

functional or cognitive impairment," or "experiencing deteriorating physical or mental health

because of . . . aging," and such condition or impairment "substantially diminishes" the defendant's

ability to care for himself.  Third, under § 1B1.13(b)(1)(C), an extraordinary or compelling reason

may exist if "[t]he defendant is suffering from a medical condition that requires long-term or

specialized medical care that is not being provided and without which the defendant is at risk of

serious deterioration in health or death."

Finally, under § 1B1.13(b)(1)(D), relief may be warranted if:

(i)      the defendant is housed at a correctional facility affected or at imminent risk
of being affected by (I) an ongoing outbreak of infectious disease, or (II) an
ongoing public health emergency declared by the appropriate federal, state,
or local authority;

(ii)     due to personal health risk factors and custodial status, the defendant is at
increased risk of suffering severe medical complications or death as a result
of exposure to the ongoing outbreak of infectious disease or the ongoing
public health emergency described in clause (i); and

(iii)    such risk cannot be adequately mitigated in a timely manner.

In my view, relief is warranted under § 1B1.13(b)(1)(D), because defendant's medical conditions place him at increased risk of suffering severe medical complications as a result of exposure to COVID-19 at FCI Butner.

First, Richardson "is housed at a correctional facility affected . . . by . . . an ongoing outbreak of infectious disease." U.S.S.G. § 1B1.13(b)(1)(D)(i). As of December 1, 2023, there were three "open cases" of COVID-19 at FCI Butner, where Richardson is housed. *Inmate COVID-19 Data*, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/about/statistics/statistics_inmate_covid19.jsp#lastestCovidData (last updated December 1, 2023).

Second, Richardson's health conditions leave him at "increased risk of suffering severe medical complications" related to infection with COVID-19. U.S.S.G. § 1B1.13(b)(1)(D)(ii). In particular, defendant's medical records suggest that he suffers from hypertension, type two diabetes, obesity, and possibly congestive heart failure. *See, e.g.,* ECF 75-2 at 8, 10, 21, 48.

The defendant's medical records indicate that, since at least December 28, 2021, defendant has been prescribed 40 milligrams of lisinopril for daily use. *Id.* at 23. Lisinopril "is used . . . to treat high blood pressure (hypertension)." *Lisinopril (Oral Route): Description and Brand Names*, MAYO CLINIC, https://perma.cc/22XW-PCAK (last accessed Dec. 4, 2023). The maximum dose "is usually not more than 40 mg per day." *Lisinopril (Oral Route): Proper Use*, MAYO CLINIC, https://perma.cc/22XW-PCAK (last accessed Dec. 4, 2023). Despite treatment with the maximum dose of lisinopril, on January 25, 2022, defendant's hypertension was characterized as "not at

23

goal."   ECF 75-2 at 10.   On that date, to treat defendant's hypertension, he was prescribed five milligrams daily of amlodipine.   *Id.*   Nonetheless, defendant's blood pressure remained "elevated"—"162/98"— when measured during an exam on February 16, 2022.   *Id.* at 5–6.

Defendant's records also indicate that, as of January 25, 2022, his body mass index ("BMI") was 38.4.   *Id.* at 8.   A person with a BMI over 30 is considered obese, and a person with a BMI over 40 is considered "severe[ly]" obese.   *Defining Adult Overweight & Obesity*, CENTERS FOR DISEASE CONTROL AND PREVENTION,   https://perma.cc/4477-WBM2   (last visited Dec. 4, 2023).   Defendant's BMI of 38.4 means that he is considered "obese," but he is approaching the threshold of "severe" obesity.   *See id.*

In addition, defendant's records reflect a diagnosis of type two diabetes on October 3, 2022; hyperlipidemia, or high cholesterol, on June 21, 2022; and sleep apnea on January 25, 2022.   ECF 75-2 at 48.

In sum, defendant's medical records show that he has hypertension that has not resolved with treatment; obesity; diabetes; high cholesterol; and sleep apnea.   According to the CDC, hypertension, obesity, and diabetes each place a person at increased risk of severe COVID-19. *People with Certain Medical Conditions*, *supra*,   https://perma.cc/923J-T5P8.   Moreover, "[t]he risk of severe illness from COVID-19 increases as the number of underlying medical conditions increases in a person." *Id.*   Therefore, I conclude that Richardson's medical conditions place him at "increased risk of suffering severe medical complications" related to infection with COVID-19. U.S.S.G. § 1B1.13(b)(1)(D)(ii).

In my view, "such risk cannot be adequately mitigated in a timely manner."   U.S.S.G. § 1B1.13(b)(1)(D)(iii).   The records available to the Court suggest that defendant's hypertension has not been controlled with treatment.   *See* ECF 75-2 at 6, 10.   Moreover, a health screening record

24

indicates that defendant has congestive heart failure, "a chronic condition that gets worse with time." *Congestive Heart Failure*, CLEVELAND CLINIC, https://perma.cc/5WRB-GQ4J (last visited Dec. 4, 2023); *see* ECF 75-2 at 21.  Therefore, defendant's health conditions place him at greater risk of severe COVID-19, and the risk to a person in a penal setting is certainly more difficult to manage as compared to the risk for a person who is not in custody.

Nor is there reason to think that the spread of COVID-19 can be "mitigated" in the relevant sense.  The number of Americans hospitalized with COVID-19 increased by ten percent between November 19, 2023, and November 25, 2023.   *COVID Data Tracker*, *supra*, https://covid.cdc.gov/covid-data-tracker/#datatracker-home.  According to a report issued by the CDC on December 1, 2023, "COVID-19 activity is increasing . . . especially in the Midwest and Mid-Atlantic regions."  *Weekly Viral Respiratory Illness Snapshot*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://perma.cc/T96J-DTLH (last updated Dec. 1, 2023).

In short, COVID-19 continues to pose a health risk, and Richardson's health conditions, according to the records provided to the Court, have not been resolved by treatment.  I am satisfied that Richardson has identified an extraordinary and compelling reason for relief under U.S.S.G. § 1B1.13(b)(1)(D).

**B.**

Having determined that Richardson has established an extraordinary and compelling reason to reduce his sentence, I must next consider whether a sentencing reduction would be consistent with the sentencing factors enumerated at 18 U.S.C. § 3553(a).

As noted, the PSR determined that defendant was a career offender.  ECF 53, ¶ 19.  This determination increased defendant's base offense level from 24 to 34.  *Id.*  As predicate offenses, the PSR designated defendant's 1999 conviction for distribution of a controlled dangerous

substance, and defendant's 2019 conviction for attempted trafficking of four to fourteen grams of heroin. *Id.* ¶ 38; *see id.* ¶¶ 28, 35. At sentencing, counsel were asked if they had "any objection to any information, including the guidelines calculations, in the" PSR, and they had no objections. ECF 66 at 3. Therefore, the Court adopted the content of the PSR, "including the calculations of the guidelines." *Id.*

Section 4B1.1(a) of the Guidelines provides, in part: "A defendant is a career offender if . . . the defendant has at least two prior felony convictions." In turn, § 4B1.2(c) plainly provides, in part (emphasis added):

> The term "two prior felony convictions" means (1) the defendant committed the instant offense of conviction *subsequent* to sustaining at least two felony convictions of either a crime of violence or a controlled substance offense . . . . The date that a defendant sustained a conviction shall be the date that the guilt of the defendant has been established, whether by guilty plea, trial, or plea of *nolo contendere*.

According to the PSR, Richardson "committed the instant offense of conviction" no later than January 4, 2017. ECF 53, ¶ 8. As a result, defendant's conduct in North Carolina in 2018, which led to his 2019 conviction in North Carolina, was not "subsequent" to "the instant offense of conviction." It follows that the 2019 conviction was not a "prior felony conviction[]" that could support defendant's classification as a career offender. *See* U.S.S.G. § 4B1.2(c). Therefore, the PSR erroneously designated defendant's 2019 conviction as a "prior felony conviction" for purposes of determining career offender status. ECF 53, ¶ 38.

It may be that another of Richardson's earlier convictions could have served as the second "prior felony conviction[]" under § 4B1.2(c) of the Guidelines, if the error had been timely discovered. But, a cure after the fact is not permissible. The Court cannot substitute a proper predicate for an ineligible predicate, merely because it could have used another predicate if the error had been discovered. *See United States v. Winbush*, 922 F.3d 227, 231 (4th Cir. 2019)

("Because the government did not identify [defendant's] robbery as a conviction it wished to use to support a career offender enhancement at the time of sentencing, it cannot raise it now that one of the convictions supporting the career offender designation has been determined to be infirm."); *see also United States v. Hodge*, 902 F.3d 420, 430 (4th Cir. 2018) (addressing Armed Career Criminal Act).

I am mindful "that a compassionate release motion cannot be used to challenge the validity of a defendant's conviction or sentence." *United States v. Ferguson*, 55 F.4th 262, 272 (4th Cir. 2022). Certainly, *Ferguson* prohibits a court from treating an error in the PSR as an extraordinary and compelling reason for compassionate release. *See id.* at 270, 271 (rejecting argument that "would require the district court, in evaluating whether 'extraordinary and compelling reasons' for compassionate release exist, to evaluate whether [defendant's] convictions . . . were valid"). However, in my view, nothing in *Ferguson* prevents a court that has already identified an extraordinary and compelling reason for relief from considering an unrelated sentencing error when assessing the sentencing factors under 18 U.S.C. § 3553(a). *See United States v. Dillman*, MFU-11-0044, 2021 WL 3083034, at *8 (W.D. Va. 2021) ("[B]ecause the court has found other grounds for compassionate release, the court will not ignore and perpetuate [an] error should it find that a sentence reduction is appropriate after considering the § 3553(a) factors."). Indeed, a court's assessment of whether the sentence under consideration "reflect[s] the seriousness of the offense . . . promote[s] respect for the law, and . . . provide[s] just punishment for the offense" would be incomplete if the court could not consider the ways in which the sentence might be erroneous. *See* 18 U.S.C. § 3553(a).

If Richardson were not classified as a career offender, his base offense level would have been 24, with a final offense level of 21 after deductions for acceptance of responsibility. ECF 53,

¶¶ 18, 20–21.  The sentencing range that corresponds to a final offense level of 21 and a criminal history category of VI is 77 to 96 months of imprisonment.  U.S.S.G. § 5A.

The government recommended a sentence ranging from 96 to 120 months of imprisonment.  *See* ECF 66 at 7.  Defendant sought a sentence of 96 months.  *Id.* at 9, 12.  And, the agreed upon range included a sentence of 96 months.  ECF 49, ¶ 10(b)(i)–(ii).

The error in the PSR relating to defendant's designation as a career offender could have affected the Court's exercise of its sentencing discretion.  As indicated, I sentenced Richardson to 100 months of imprisonment—four months more than the upper end of the range to which defendant would have been subject had he not been designated a career offender, ECF 59 at 2; four months above the low end of the range agreed to by the parties, ECF 49, ¶ 10(b)(i)–(ii); and four months more than the low end of the range requested by the government at sentencing.  ECF 66 at 7.  In my view, the Court's interests in ensuring that the sentence imposed "reflect[s] the seriousness of the offense . . . promote[s] respect for the law, and . . . provide[s] just punishment for the offense" all weigh in favor of granting a modest reduction in defendant's sentence.  *See* 18 U.S.C. § 3553(a)(2)(A).

The FSA "does not constrain the Court to decide between immediate release or no reduction at all, and instead leaves the Court discretion in its evaluation of the appropriate sentence once it finds 'extraordinary and compelling reasons.'"  *United States v. Braxton*, JKB-09-478, 2020 WL 4748536, at *5 (D. Md. Aug. 17, 2020).  Indeed, the statutory text of the First Step Act allows courts to "reduce the term of imprisonment" upon a finding of "extraordinary and compelling reasons."  18 U.S.C. § 3582(c)(1)(A).

Numerous district courts in both this Circuit and others have granted sentence reductions without immediate release. *See, e.g.*, *United States v. Johnson*, RDB-07-0153, 2020 WL 6063733,

at *5 (D. Md. Oct. 14, 2020) (reducing sentence from 360 months to 300 months); *Braxton*, 2020 WL 4748536, at *5 (reducing sentence from 246 months to 168 months); *United States v. Marks*, 455 F. Supp. 3d 17, 37–38 (W.D.N.Y. 2020) (reducing sentence from 40 years to 20 years); *United States v. Arey*, Crim. No. 5:05-00029, 461 F.Supp.3d 343, 2020 WL 2464796 (W.D. Va. May 13, 2020) (reducing sentence but denying immediate release); *United States v. Day*, 474 F. Supp. 3d 790 (E.D. Va. 2020) (same); see *also United States v. Zullo*, 976 F.3d 228, 327 (2d Cir. 2020) ("It bears remembering that compassionate release is a misnomer. 18 U.S.C. § 3582(c)(1)(A) in fact speaks of sentence reductions. A district court could, for instance, reduce but not eliminate a defendant's prison sentence . . . ."). Therefore, I may reduce defendant's sentence to 96 months of imprisonment without granting immediate release.

Defendant's "history and characteristics" do not preclude granting some relief. *See* 18 U.S.C. § 3553(a)(1). All but two of Richardson's twelve adult criminal convictions have been related to the use, possession, or distribution of alcohol or drugs. *See* ECF 53, ¶¶ 1–2, 25–35. Although defendant's history of substance abuse certainly cannot excuse his criminal offenses, it may partially explain them.

Nonetheless, Richardson's extensive criminal history is troubling. And, as noted, Richardson recently committed two disciplinary infractions while incarcerated: "possessing drugs/alcohol" and "refusing to obey an order." *See* ECF 75-4. He committed both infractions in October 2022. *Id.* In view of the serious nature of the offense, Richardson's extensive criminal history, and his recent prison disciplinary record, a sentence reduction of more than four months is not warranted.

## V.  Conclusion

For the foregoing reasons, I shall grant the Motion in part and reduce defendant's sentence to 96 months of imprisonment.  All terms and conditions of the supervised release imposed by the Judgment of December 2, 2021 (ECF 59) shall remain in effect.

An Amended Judgment shall issue.

An Order follows, consistent with this Memorandum Opinion.


Date:   December 7, 2023                                          _____/s/_____
                                                                 Ellen Lipton Hollander
                                                                 United States District Judge